UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

JEFFREY LEMEROND,                                          07 Civ. 4635 (LAP)

                              Plaintiff,

        – against –

TWENTIETH CENTURY FOX FILM CORP.,

                              Defendant.
-----------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

Attorneys for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (ii)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.      PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF
           SECTION 51 OF THE NEW YORK CIVIL RIGHTS LAW . . . . . . . . . . . . . . . 4

          A.    This Court Cannot Hold at the Pleading Stage That the
               "Public interest" Exception Applies as a Matter of Law . . . . . . . . . . . . . . 4

               1.    The Film Is Not "Newsworthy" as a Matter of Law . . . . . . . . . . 4

               2.    The Unauthorized Use of Plaintiff's Likeness Does
                      Not Have a "Real Relationship" to the Film's Putative
                      Purpose as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          B.    This Court Cannot Hold at the Pleading Stage That the
               Misappropriation of Plaintiff's Likeness Was "Incidental"
               as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TABLE OF AUTHORITIES

FEDERAL CASES

*Geary v. Goldstein,*
    831 F. Supp. 269 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 12

*Man v. Warner Bros., Inc.,*
    317 F. Supp. 50 (S.D.N.Y. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Myskina v. Condé Nast Publ'ns, Inc.,*
    386 F. Supp. 2d 409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Titan Sports, Inc. v. Comics World Corp.,*
    870 F.2d 85, (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8


STATE CASES

*Abdelrazig v. Essence Comms., Inc.,*
    225 A.D.2d 498 (1st Dept. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arrington v. New York Times Co.,*
    55 N.Y.2d 433 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Beverley v. Choices Women's Med. Ctr.,*
    141 A.2d 89, 532 N.Y.S.2d 400 (2d Dept. 1988), *aff'd*, 78 N.Y.2d 745 (1991). . . . 4, 6-7

*DeGregorio v. CBS,*
    123 Misc.2d 491, 472 N.Y.S.2d 922 (Sup. Ct. N.Y. Co. 1984) . . . . . . . . . . . . . . . . . . 13

*Finger v. Omni Publications Intl.,*
    77 N.Y.2d 138 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Frank v. Natl. Broadcasting Co.,*
    119 A.D.2d 252, 506 N.Y.S.2d 869 (2d Dept 1986) . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Gautier v. Pro-Football,*
    304 N.Y. 354 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hampton v. Guare,*
    195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dept. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Messenger v. Gruner + Jahr Printing and Publ'g*,
    94 N.Y.2d 436 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nieves v. Home Box Office, Inc.*,
    30 A.D.3d 1143, 817 N.Y.S.2d 227 (1st Dept. 2006) . . . . . . . . . . . . . . . . . . . . 2, 8, 17-18

*Stephano v. News Grp. Publ'ns Inc.*,
    64 N.Y.2d 174 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ward v. Klein*,
    10 Misc.3d 648, 809 N.Y.S.2d 828 (Sup. Ct. N.Y. Co. 2005) . . . . . . . . . . . . . . . . . . . . 13

Plaintiff Jeffrey Lemerond ("Plaintiff"), by and through his attorneys, Emery Celli Brinckerhoff & Abady LLP, respectfully submits this memorandum of law in opposition to the motion of Defendant Twentieth Century Fox Film Corporation ("Defendant" or "Fox") to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The area of disagreement between the parties on this motion is relatively narrow and focused. Plaintiff has no quarrel with many of Defendant's premises. Films that report "newsworthy events" and "matters of public interest" do not give rise to liability under section 51 of the New York Civil Rights Law. The film at issue in this case – "*BORAT – Cultural Learnings of America for Make Benefit Glorious Nation of Kazahkstan*" (the "Film") – touches upon issues of social importance. The fact that the Film is dominated by outrageous, sexually explicit, and often extremely offensive tomfoolery does not, in and of itself, necessarily mean that the "public interest" exception does not apply. The fact that the Film is funny does not, in and of itself, necessarily mean that the "public interest" exception does not apply. And the fact that the Film generated hundreds of millions of dollars in revenues for Defendant does not, in and of itself, necessarily mean that the "public interest" exception does not apply.

But none of this is to say that Defendant has definitively proven, at this preliminary pleading stage, that the "public interest" exception applies as a matter of law. To the contrary, well-established precedent confirms that Defendant has not. *See Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87-89 (2d Cir. 1989) (holding that an "insignificant public

1

interest aspect" of a work does not trigger the exception to section 51 "where the primary aspect of the product is commercial," and that whether this standard is met presents a question of fact that cannot be resolved on a motion to dismiss); *Nieves v. Home Box Office,* Inc., 30 A.D.3d 1143, 817 N.Y.S.2d 227 (1st Dept. 2006) (affirming denial of motion to dismiss where defendant asserted that documentary on bounty hunters qualified for "public interest" exception to section 51).

We do not pretend that the ultimate answer to the question of whether the Film qualifies for protection under the "public interest" exception is easy.  But neither can Defendant pretend that just because the Film touches on social issues, the law places no limits on Defendant's ability to pluck an otherwise anonymous citizen from a crowd, without his consent, subject him to public ridicule, and exploit the incident for profit.  There *are* limits, and at the appropriate juncture, this Court will be asked to rule on whether Defendant crossed the line.  At this preliminary stage, there can be no doubt that Plaintiff has stated a cognizable claim for relief, and that Defendant is not entitled to dismissal pursuant to Rule 12(b)(6).

## **FACTS**

In the scene in which Plaintiff is depicted in the Film, Borat approaches Plaintiff in midtown Manhattan and says "Hello, nice to meet you."  Plaintiff responds by running away.

Plaintiff is not a public figure.  He did nothing to invite this encounter.  He was merely walking down a congested Manhattan street, blended in with the crowd, when Borat accosted him.

Plaintiff did not consent to the use of his likeness in the Film. He did not sign a release. He was never asked, verbally or in writing, for his consent.

The Film shows Plaintiff's encounter with Borat not once but twice – first, toward the beginning of the Film, and then again in a retrospective montage that appears toward the end of the Film. (The "Sequence" that Defendant burned onto the DVD that is appended as Exhibit B to the Bogin Declaration does not include the montage that appears toward the end of the Film.)

Defendant also included Plaintiff's likeness in the trailer for the Film. For some reason – we do not yet know why – Defendant scrambled Plaintiff's face in the trailer. But Defendant did not scramble Plaintiff's face in either of his appearances in the Film.

We assume the Court's familiarity with the Film, together with all of the other materials – such as deleted scenes and post-production promotional scenes – that are included on the DVD that Defendant put into the record on this motion as Exhibit A to the Bogin Declaration. Notably, the Film's trailer is not part of the record on this motion. Defendant purposefully excluded the trailer from the materials it submitted to the Court.

Although Defendant claims that the Film portrays people's "authentic reactions" to Borat's antics, *see* Def. Br. at 12, it has been widely reported that the Film passed off as "authentic" at least two scenes that apparently were at least partially staged: the scene in which Borat hitches a ride with three racist/misogynist fraternity brothers, and the scene in which Borat attempts to kidnap Pamela Anderson. In other words, contrary to what the audience was led to believe, the three fraternity brothers who appeared in the Film many not have been actually expressing their "authentic" views about women, minorities, or anything else.

3

The Film grossed over $260 million at the box office, and grossed over $60 million in DVD sales.

## ARGUMENT

I.    **PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF SECTION 51 OF THE NEW YORK CIVIL RIGHTS LAW**

Section 51 of the New York Civil Rights Law creates a cause of action in favor of "[a]ny person whose name, portrait or picture is used within this state for advertising purposes or for purposes of trade without . . . written consent." Defendant does not dispute that it exploited Plaintiff's likeness for profit without his consent. Defendant argues, however, that it is entitled to dismissal because it qualifies, as a matter of law, for the judicially-created exception to section 51 for works that are "newsworthy" and of significant "public interest." *Beverley v. Choices Women's Med. Ctr.*, 141 A.2d 89, 94, 532 N.Y.S.2d 400 (2d Dept. 1988), *aff'd*, 78 N.Y.2d 745 (1991). To establish entitlement to this exception, Defendant must demonstrate (1) that the Film is newsworthy and of public interest, and (2) that there is a "real relationship" between the use of Plaintiff's likeness and the newsworthy purpose of the Film. For the reasons that follow, Defendant has failed, on this motion, to meet its burden on both prongs of this test.

A.    **This Court Cannot Hold at the Pleading Stage That the "Public interest" Exception Applies as a Matter of Law**

1.    **The Film Is Not "Newsworthy" as a Matter of Law**

It bears emphasis at the outset that the Film is *not* a documentary. Rather, as Defendant itself puts it, it is a "documentary-*style*" Film that tells the entirely "fictional story" of Borat Sagdiyev ("Borat"), a chimerical character who goes on a trip to America. *See* Def. Br. at

4

10 (emphasis supplied); Bogin Decl. ¶ 3.  During the Film, Borat has numerous experiences that, while undoubtedly funny to many people, are, to say the least, atypical of the works that courts previously have found to fall within the "public interest" exception to section 51.  The real thrust (and wit) of the film is Borat's raucous, off-color, slapstick antics, including:

- Tongue-kissing his sister, who he points out is the "number four prostitute in all of Kazakhstan";

- Openly masturbating on a Manhattan street in front of the window of a Victoria's Secret store displaying female mannequins dressed in lingerie;

- Boasting about the size of his adolescent son's penis, an actual photo of which is prominently displayed in the Film;

- Describing his hobby of photographing women "making toilet";

- Delivering a bag of his own recently-expelled feces to a dinner party; and

- Participating in an all-nude hotel room brawl during which he and his overweight male friend grab each other's penises, bite each other's nipples, and stick and rub their testicles and anuses in each other's faces.

*See generally* Bogin Decl., Exh. A (DVD of the Film); *see also*, *e.g.*, "Promotions of Moviefilm" portion of DVD (which contains footage and materials that were not part of the theatrical release, including a real-life segment in which Borat actually appears on the "Late Night with Conan O'Brien" television show and successfully convinces Conan O'Brien to admit to his millions of viewers that he has red pubic hair).

Notwithstanding that the Film is dominated by what Defendants refer to as "scatological humor," *see* Def. Br. at 13, Defendant insists that this Court must conclude – as a matter of law, at the pleading stage – that the Film falls within the "newsworthiness" exception to section 51 because it depicts matters of "public interest."  Specifically, Defendant posits that

the Film is "a social commentary about how Americans respond to foreign travelers who have

atypical and offensive predilections and behavioral tendencies," and that it "expose[s]

Americans' authentic reactions to an eccentric foreign visitor who exhibits unorthodox opinions

and behaviors." *Id.* at 12, 14.  It may well be that this asserted theme is present, to some extent,

in the Film.  But Defendant plainly is not entitled to dismissal under Rule 12(b)(6).

New York law is clear that the mere fact that the Film may have *some* social,

political, or educational value does not give Defendant carte blanche to misappropriate and

exploit Plaintiff's likeness with impunity.  For example, in *Beverley v. Choices Women's Med.*

*Ctr.*, 141 A.2d 89, 532 N.Y.S.2d 400 (2d Dept. 1988), *aff'd*, 78 N.Y.2d 745 (1991), the plaintiff

was a female physician who had attended the "Third Regional Conference of Women in

Medicine," a conference that was organized by the Women's Medical Association of New York

City to "examine the impact of increasing numbers of women in medicine," to "explore critical

issues in women's health care," and to "assist and support women in medicine."  41 A.D.2d at

90-91.  During this conference, the plaintiff was photographed sitting next to Dr. Lena Edwards,

a well-known activist physician who had been awarded the Freedom Medal.  *Id.* at 91-92.  That

photograph was subsequently used by the defendant, a women's medical center, in a calendar it

published celebrating the women's movement.  *Id.* at 91.  Dr. Beverley brought suit under section

51, alleging that the calendar was a mere advertisement for the defendant's medical services.

Following discovery, the defendant moved for summary judgment, arguing that the calendar was

protected by the "public interest" exception because it "depicts a matter of legitimate public

interest, *i.e.*, the development and activities of the organized women's or feminist movement in

this country."  *See id.* at 95.  The Supreme Court disagreed, and the Appellate Division affirmed,

6

holding that a commercial product does not fall within the "public interest" exception merely
because it may also serve some educational purpose:

> [The defendant's] approach would create a loophole in the statute which
> would invite abuse and virtually vitiate the protection afforded therein to
> those who are commercially exploited. Indeed, it has been held that the
> unauthorized use of a person's picture in an advertisement of a collateral
> product or service cannot be justified on the ground that the picture also
> serves an "educational" or informative purpose.

*Id.* at 95. Indeed, far from dismissing the plaintiff's section 51 claim at the pleading stage, the
Appellate Division affirmed the Supreme Court's grant of *summary judgment to the plaintiff*.
*See id.*

A unanimous New York Court of Appeals affirmed. In doing so, the Court of
Appeals emphasized that a defendant "may not unilaterally neutralize or override the long-
standing and significant statutory privacy protection by wrapping its advertising message in the
cloak of public interest." 78 N.Y.2d at 752. "[T]o hold otherwise," the Court emphasized,
"would diminish the statutory privacy protection against exploitation of a person's name or
likeness. Ordinary citizens are entitled to the protective mantle of this statute . . . ." *Id.* at 753;
*see also id.* ("New York law gives Dr. Beverley a broad, remedial statutory privacy interest and
the right not to be associated with or identified with causes or enterprises, to their benefit and at
her expense, without her consent."); *id.* (referring to the "precious protection" afforded by section
51); *see also Robinson v. Snapple Beverage Corp.*, 2000 WL 781079, at *4 (S.D.N.Y. Jun. 19,
2000) (granting summary judgment to the plaintiff and holding that the "public interest"
exception did not apply as a matter of law to a public service message promoting the Goodwill
Games that also served as an advertisement for Snapple iced tea).

7

Consistent with *Beverley*, the Second Circuit has squarely held that an "insignificant public interest aspect" of a work does not trigger the exception to section 51 "where the primary aspect of the product is commercial," and that whether this standard is met presents a question of fact that is not susceptible to resolution through motion practice – at all, and certainly not on a motion to dismiss:

> [T]he New York Courts have recognized that an insignificant public interest aspect of a "publication" cannot exempt it from the reach of section 51 where the primary aspect of the product is commercial.

*See Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87-88 (2d Cir. 1989). In *Titan Sports*, the Second Circuit denied the defendant's motion for summary judgment in a case involving photographs contained in the centerfolds of a popular wrestling magazine. In doing so, the Court emphasized that the applicability of the "public interest" exception presented a "genuine issue of material fact" that would have to be tried before a fact-finder, and that "the fact-finder should consider a variety of factors, including but not limited to the nature of the item, the extent of its relationship to the traditional content of a magazine, the ease with which it may be detached from the magazine, whether it is suitable for use as a separate product once detached, and how the publisher markets the item." *Id.* at 89; *see also Nieves v. Home Box Office,* Inc., 30 A.D.3d 1143, 817 N.Y.S.2d 227 (1st Dept. 2006) (affirming denial of motion to dismiss where defendant asserted that documentary on bounty hunters qualified for public interest exception); *Geary v. Goldstein*, 831 F. Supp. 269, 271, 276-77 (S.D.N.Y. 1993) (denying motion to dismiss because "there [was] a factual dispute over whether the adaptation falls within the public interest exception"). *Titan Sports*, *Nieves*, and *Geary* thus make clear that Defendant's motion is, at best, premature.

8

In determining whether the Film deserves "public interest" protection, the fact-finder in this case will have to do far more than merely weigh the Film's alleged "social commentary" against the "scatological humor" that overwhelms it.

To begin with, the fact-finder will have to consider the extent to which the supposedly "authentic reactions" (as Defendant puts it, *see* Def. Br. at 12) of the people featured in the film were, in fact, *staged*. It has been widely reported that the Film passed off as "authentic" at least two scenes that may actually have been at least partially scripted in advance: the scene in which Borat hitches a ride with three racist/misogynist fraternity brothers, and the scene in which Borat attempts to kidnap Pamela Anderson. The fraternity brothers scene is particularly instructive, for that clearly is one of the most disturbing scenes in the movie. The audience is led to believe that the fraternity brothers spontaneously picked Borat up by the side of the road, believed him to be a real-life Kazakh on an American journey, and engaged him in "authentic" conversation about their unabashed hatred of women ("bitches") and minorities. If it turns out that this scene was staged – that Defendant's agents actually met the fraternity brothers the day before and encouraged them to make sexist and racist remarks – would that not be relevant to Defendant's claim that the Film fits within the "public interest" exception to section 51? Is Defendant seriously suggesting that the law draws no distinction whatsoever between a "documentary-style" Film that is only half fake – Borat is a fictional character, but he actually is engaging with real people espousing their truly "authentic" views – and a film that is *entirely* fake because *everyone* is in on the gag? Surely Plaintiff is entitled to discover the extent to which the views espoused by the homophobic rodeo man and the anti-semitic gun shop owner (to

9

name just two examples) were "authentic" before Defendant can claim entitlement to outright dismissal as a matter of law.

It also is highly relevant in this case that the Plaintiff is not a public figure. To the contrary, Plaintiff is an ordinary, anonymous citizen, and he was doing no more than walking down the street, minding his own business, when he was accosted and filmed by Defendant. As the New York Court of Appeals has held, an "individual may not be singled out and unduly featured merely because he is on the scene." *Gautier v. Pro-Football*, 304 N.Y. 354, 359 (1952). As *Gautier* explained, it is reasonably foreseeable that a citizen who attends a football game might be photographed as part of a crowd of spectators, but he or she "may not be picked out of a crowd alone, thrust upon the screen and unduly featured for public view." *Id.* at 360. Only when "one is a public personage, an actual participant in a public event, or where some newsworthy incident affecting him is taking place" does "the right of privacy" become "limited." *Id.* Here, Plaintiff plainly is not a public figure, did not participate in any public event, and was not affected by any newsworthy event. He was simply out for a stroll when Defendant selected him as its prey. *Gautier* makes clear that Defendant may well have had the right to film Plaintiff as a mere member of a crowd blending into the streetscape, but that Defendant had no right to single him out without his consent, subject him to public ridicule, and exploit the filming of this incident for profit. *See also Geary*, 831 F. Supp. at 274 & n.4 (noting, in denying motion to dismiss, that the plaintiff was not "a public figure whose actions are inherently of interest to the public," and holding that the defendant was "flatly wrong" to suggest that whether the plaintiff was a public figure was irrelevant to whether the "public interest" exception applied).

10

Here, moreover, Plaintiff's likeness was used not only in the Film, but in the Film's trailer as well. The very purpose of a movie trailer, of course, is to serve as an *advertisement* for the movie. Surely Defendant cannot claim that it did not use Plaintiff's likeness "for advertising purposes" (the words of the statute) given that they included his scene in the Film's trailer. Attempting to evade this issue, Defendant argues, in a footnote, that the trailer is "irrelevant" because Plaintiff's face was scrambled in the trailer and, thus, "there was no recognizable image of him." *See* Def. Br. at 8-9 n.6. This is a sleight of hand. Defendant did not scramble Plaintiff's face in the Film itself. Most people who know Plaintiff and saw the Film know that Plaintiff is in the Film. Now that it is widely known that Plaintiff is in the Film, anyone who watches the trailer – which is widely available on the Internet, and which presumably continued to play in theaters even after the Film was first released – knows that Plaintiff is in the trailer. At a bare minimum, Plaintiff is entitled to engage in discovery and build a factual record establishing the extent to which the trailer was broadcast after the Film was released. Plaintiff will prove, moreover, that at least one person recognized Plaintiff from the trailer, even though his face was scrambled. It certainly cannot be said at the pleading stage that Defendant's inclusion of Plaintiff in the Film's trailer is categorically irrelevant as a matter of law.[1]

Defendant spends considerable energy arguing that comedies can fall within the "public interest" exception to section 51. We agree. The mere fact that a movie is funny does

---

[1] As will be discussed in Part I.B, *infra*, the trailer – which Defendant purposefully omitted from the record on this motion – is also relevant to Defendant's specious argument that the "incidental" exception to section 51 applies as a matter of law.

not, in and of itself, mean that it cannot fall within the exception. But that is a far cry from saying that the fact that something is funny *affirmatively weighs in favor* of applying the "public interest" exception, which obviously is not the case. Imagine, for example, that a satirical television program shows a photograph of Vice President Cheney holding a hunting rifle, and that a commentator makes an off-color joke about the irony that a politician who so staunchly opposes gun-control laws would end up shooting his good friend in the face. The publication of that photograph, even without authorization, plainly would be protected under the "public interest" exception, notwithstanding the fact that many people might find it funny. To illustrate the converse, however, imagine that the very same satirical program obtains candid photographs taken with a telephoto lens of a 12-year-old boy in his bedroom masturbating into a jar of peanut butter. The unauthorized publication of those photographs plainly would not be protected, even if it turned out that many people thought it was funny. As the Court put it in *Geary*, "as forms of expression, humor and comedy have never been held to be entitled to *absolute or categorical*" protection. 831 F. Supp. at 274 (quoting *Frank v. First National Broadcasting Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869 (2d Dept. 1986)) (emphasis supplied). Whether the Film contains sufficiently weighty social commentary to entitle it to protection is a fact question that cannot be resolved on this motion, regardless of how funny or not funny people may find the Film.

Defendant also contends that its profit motive is categorically immaterial to the "public interest" inquiry. *See* Def. Br. at 15-16. That is a considerable exaggeration. While it certainly is true that a work is not *per se* unprotected merely because it was produced for profit, it is equally clear that the existence of a profit motive, and the degree of a profit motive, can be relevant, at least in some cases. Is Defendant suggesting that the "precious protection" afforded

12

by section 51 (as the Court of Appeals put it in *Beverley*) is analyzed in exactly the same way when the work in question is a pay-per-view Wrestlemania "cage match," as opposed to a Frontline special produced on a not-for-profit basis by the Public Broadcasting Service and funded by the Bill and Melinda Gates Foundation? That obviously is not the law. Especially where, as here, the work at issue is not an actual documentary but rather a big-budget Hollywood blockbuster containing copious material that is staged and passed off as "authentic," Plaintiff is entitled to discover at least basic information on the degree to which the Film was intended to, and did, enrich Defendant.

None of the cases cited by Defendant compels the conclusion that it is entitled to dismissal under Rule 12(b)(6). Many of the cases it relies upon are summary judgment cases, not pre-discovery motion to dismiss cases. *See, e.g., Stephano v. News Grp. Publ'ns Inc.*, 64 N.Y.2d 174 (1984); *Messenger v. Gruner + Jahr Printing and Publ'g*, 94 N.Y.2d 436 (2000) (in which, notably, the plaintiff expressly conceded that the work was "newsworthy," and the only issue was the relevance of a false light claim); *Kane v. Comedy Partners*, 2003 WL 22382287 (S.D.N.Y. Oct. 16, 2003); *Abdelrazig v. Essence Comms., Inc.*, 225 A.D.2d 498 (1st Dept. 1996); *Glickman v. Stern*, 19 Media L. Rptr. 1769 (Sup. Ct. N.Y. Co. 1991); *DeGregorio v. CBS*, 123 Misc.2d 491, 472 N.Y.S.2d 922 (Sup. Ct. N.Y. Co. 1984). Some of the cases Defendant cites involved public figures. *See Myskina v. Condé Nast Publ'ns, Inc.*, 386 F. Supp. 2d 409 (recent French Open tennis champion); *Kane*, *supra* (television personality). Some of the cases involved actual documentaries, rather than a "documentary-style" farce in which many of the "real" people who appear are in fact amateur actors. *See Ward v. Klein*, 10 Misc.3d 648, 809 N.Y.S.2d 828 (Sup. Ct. N.Y. Co. 2005) (documentary on well-known music personality); *Man v. Warner Bros., Inc.*,

317 F. Supp. 50 (S.D.N.Y. 1970) (documentary on Woodstock music festival). Some of them involved works that plainly did not misappropriate the plaintiff's image at all. *See Hampton v. Guare*, 195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dept. 1993); *Frank v. Natl. Broadcasting Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869 (2d Dept 1986). Some of them were brought by plaintiffs who had signed valid releases. *See Doe v. One America Productions, Inc.* (Sup. Ct. Los Angeles Co. Feb. 15, 2007) (Exhibit B to Def. Br.) (involving an entirely different state statutory scheme); *Weil v. Johnson*, 2002 WL 31972157 (Sup. Ct. N.Y. Co. Sep. 27, 2002); *Myskina*, *supra*.[2] Finally, some of them involved plaintiffs who had affirmatively injected themselves into the work at issue. *See Glickman*, *supra* (plaintiff deemed an "active participant" because he voluntarily identified himself on the challenged radio program).

At the end of the day, Defendant's theory of the breadth of the "public interest" exception to section 51 simply proves too much. According to Defendant, it would be absolutely immune from civil suit if, hypothetically, Defendant were to produce a sequel to the Film in which Borat struggles to understand the meaning of, and Americans' attitudes toward, the First Amendment. Imagine that this hypothetical sequel includes a scene in which Borat engages in some grossly obscene or extreme conduct involving a visibly recognizable photograph of Nikita Emery, the three-year-old daughter of Richard Emery, one of the attorneys representing Plaintiff

---

[2] Most of the plaintiffs who have sued Defendant over the Film in other actions signed releases. Indeed, on information and belief, virtually *everyone* depicted in the Film – other than Plaintiff – signed a release. Tellingly, Defendant even went so far to place a tag at the end of the Conan O'Brien sequence (the one contained in the "Promotions of Moviefilm" portion of DVD) making clear that the clip was "courtesy of NBC Studios, Inc." Surely Plaintiff is entitled to take discovery and establish a clear record about the extent to which releases were obtained prior to the adjudication of Defendant's motion for judgment as a matter of law.

14

in this action. Imagine, for example, that Borat defecates on Nikita's visibly recognizable image, exclaiming: "I do shit puddle on face of whore-daughter of attorney who make mockery of First Amendment!" Imagine further that Defendant tests this scene in focus groups, learns that the coveted 18-30 demographic thinks it is hilarious, and therefore (a) adds a slow-motion replay of the defecation scene to a retrospective montage at the end of the sequel, and (b) uses the defecation scene as a key component to the sequel's advertising trailer. (Though Defendant scrambles Nikita's face in the trailer, it does not scramble her face in the movie itself). Never mind that Nikita is not even remotely a public figure. Never mind that she did nothing whatsoever to invite or welcome such a horror. Never mind that her parents never signed a release. Never mind that the sequel grosses over $300 million. According to Defendant, it has absolute and unqualified free reign to show Nikita's photo covered with feces, and to profit handsomely by doing so, so long as it is done in the context of a movie that satires Americans' attitudes toward the First Amendment, and so long as Mr. Emery's status as a prominent First Amendment attorney lends a modicum of "real connection" between the scene and the satire as a whole. Nikita is entitled to no discovery. She has no remedy as a matter of law. Can this be?

We recognize that this is an unorthodox – and perhaps borderline – hypothetical to include in a legal memorandum. But Defendant's motion raises a critical question for this Court and for society as a whole: are there really no limits on Borat's ability to pluck otherwise anonymous citizens out of a crowd and subject them to public ridicule for profit in the name of the "public interest"? We challenge Defendant to articulate a formulation of the "public interest" exception to section 51 that would vest Nikita with a cause of action against Defendant in the

above hypothetical, but which also would entitle Defendant to pre-discovery dismissal as a matter of law in this case.

### 2. The Unauthorized Use of Plaintiff's Likeness Does Not Have a "Real Relationship" to the Film's Putative Purpose as a Matter of Law

This Court need not reach the "real relationship" issue if it concludes, as we urge, that Defendant cannot establish as a matter of law at the pleading stage that the Film satisfies the "public interest" test. Defendant concedes that in order to prevail on its motion, it must establish *both* that the Film satisfies the "public interest" test *and* that there is a "real relationship" between its newsworthy message and its unauthorized use of Plaintiff's likeness. *See* Def. Br. at 8. If the Court concludes that discovery on the "public interest" issue is warranted, then the "real relationship" issue need not be addressed at this juncture (and vice versa).

In any event, it is plain that whether there is a "real relationship" between Defendant's unauthorized use of Plaintiff's likeness and the Film's alleged "social commentary about how Americans respond to foreign travelers" begs factual questions that cannot be resolved on this motion. To begin with, nothing in the scene depicting Plaintiff even suggests, much less confirms as a matter of law, that Plaintiff had any idea that the fictional character Borat was a foreigner. By Defendant's own admission, and as is evident on the face of the sequence, Borat said nothing more than "nice to meet you" before Plaintiff ran away from him. Plaintiff plainly was bothered that he was being accosted on the street by a bizarre stranger – presumably a crazy New Yorker – but nothing suggests he had any idea that Borat was a foreigner, Kazakh or otherwise. Because Defendant cannot demonstrate that Plaintiff was aware that Borat was visiting from abroad – at all, much less as a matter of law – its argument that there is a "real

16

connection" between Plaintiff and any theme of Americans' "reactions to an eccentric foreign visitor" falls of its own weight.

Viewed this way, Plaintiff's appearance in the Film stands in stark contrast to the gentleman whose appearance immediately precedes Plaintiff's appearance. When Borat approaches that gentleman, he says: "Hello, my name Borat. I am new in town. I kiss you." The gentleman then responds: "You kiss me and I'll pop you in the fucking balls." This exchange at least arguably has a "real connection" to the alleged theme of Americans' "reactions to an eccentric foreign visitor" because Borat expressly made the gentleman aware that he was "new in town." But the same is not true of Plaintiff. Borat did not tell Plaintiff he was "new in town." He merely said "nice to meet you." The fact that Plaintiff ran away thus sheds no light whatsoever on, and has no "real connection" to, Americans' attitudes toward foreigners.

The difference between Plaintiff's appearance and those of various other people featured in the movie makes the point even more clearly. The homophobic rodeo man, the dinner party guests, the driving instructor, the Jewish innkeepers, and the drunken fraternity brothers (among many others) all had *extensive* discussions with Borat about the fact that he was traveling from Kazakhstan, was new to the United States, did not understand how to use indoor plumbing, was accustomed to the ability to have sex with any woman he saw on the street for a price, etc. Plaintiff is one of the very few people in the entire movie who plainly had no basis to know that Borat was from abroad.

This aspect of Defendant's motion is therefore controlled by the Appellate Division's recent opinion in *Nieves v. Home Box Office,* Inc., 30 A.D.3d 1143, 817 N.Y.S.2d 227 (1st Dept. 2006). In *Nieves*, the First Department affirmed the denial of a motion to dismiss

17

brought by the producers of a documentary about bounty hunters.  The documentary included footage of a woman who happened to be present when bounty hunters arrived looking for a fugitive.  Some of the bounty hunters "crudely debated" the subject of the woman's "sexual allure."  The First Department held that "the motion to dismiss the complaint was properly denied," because whether "the use of plaintiff's image in this manner bore a 'real relationship' to the subject matter of the show," versus whether she was "singled out and unduly featured merely because she was on the scene," presented a disputed factual question.  Here, the very same disputed factual issue is also presented.

Defendant's preemptive attempt to dismiss *Nieves* as an "outlier in a long line of cases" is unavailing.  *See* Def. Br. at 15 n.8.  Neither of the two cases cited by Defendant suggests that they are entitled to a "real relationship" finding as a matter of law on this motion.  In *Finger v. Omni Publications Intl.*, 77 N.Y.2d 138, 143 (1990), there plainly was a "real relationship between the fertility theme of the [magazine] article [in question] and the large family depicted in the photograph."  And in *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 440-41 (1982), not only was there an obvious fit between the manner in which the plaintiff was dressed in his photograph and the associated article on the "black middle class," but the Court actually denied the motions to dismiss brought by all defendants other than the newspaper itself, finding that issues of fact were presented regarding those defendants' respective roles.  *See id.* at 442-43.

For all of these reasons, Defendant's attempt to establish a "public interest" defense on this motion fails.

18

**B.      This Court Cannot Hold at the Pleading Stage That the Misappropriation of Plaintiff's Likeness Was "Incidental" as a Matter of Law**

Defendant's half-hearted suggestion, made in a passing footnote, that Plaintiffs' appearance was, as a matter of law, too "fleeting and incidental" to be actionable can be disposed of in short order. *See* Def. Br. at 9 n.7. First, Defendant used Plaintiff's image in the Film not once but *twice*, the second time as part of a retrospective montage of some of the best moments in the Film. Second, Defendant used Plaintiff's scene in the Film's trailer, expressly capitalizing on Borat's exchange with Plaintiff to sell the Film to potential viewers. Defendant has not cited and cannot cite any case in which an appearance was held to be too "incidental" to be actionable under such circumstances.[3]

---

[3] The so-called "Sequence" depicted on the DVD appended as Exhibit B to the Bogin Declaration does *not* contain the Plaintiff's second appearance in the montage towards the end of the Film. Nor has Defendant made the Film's trailer part of the record on its motion. Surely this Court cannot dismiss Plaintiff's appearances as too incidental to be actionable as a matter of law without considering the trailer. Defendant's purposeful omission of the trailer from the record on this motion is reason enough to deny the relief it seeks.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendant's motion to dismiss should be denied.

Dated:  August 17, 2007
       New York, New York

EMERY CELLI BRINCKERHOFF &
ABADY LLP

/s Richard D. Emery
Richard D. Emery (RE 5181)
Eric Hecker (EH 0989)
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

*Attorneys for Plaintiff*

20